BRYAN SCHRODER
United States Attorney

KELLY CAVANAUGH
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 W. 7th Avenue, #9, Room 253
Anchorage, AK 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-6011
Email: kelly.cavanaugh@usdoj.gov

Counsel for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. |
| Plaintiff, | **VERIFIED COMPLAINT FOR FORFEITURE *IN REM*** |
| vs. | |
| $43,234.00 IN UNITED STATES CURRENCY, | |
| Defendant. | |

Plaintiff United States of America, by and through counsel, alleges the following:

## I.  NATURE OF THE ACTION

This is a civil action *in rem* brought to enforce the provisions of 21 U.S.C. § 881(a)(6), for the forfeiture of $43,234.00 IN UNITED STATES CURRENCY, which is hereby alleged to constitute moneys or other things of value furnished or intended to be furnished in exchange for a controlled substance, proceeds traceable to such an exchange,

and moneys used or intended to be used to facilitate violations of 21 U.S.C. §§ 841, *et seq.*

## II. JURISDICTION AND VENUE

This Court has jurisdiction over this matter by virtue of 28 U.S.C. §§ 1345 and 1355, and 21 U.S.C. § 881. This is a forfeiture proceeding based upon violations of 21 U.S.C. §§ 841 and 881.

The Court has venue pursuant to 28 U.S.C. § 1395. Defendant $43,234.00 was seized within the District of Alaska.

## III. RELEVANT FACTS

The facts and circumstances supporting the seizure and forfeiture of Defendant $43,234.00 are contained in Exhibit 1, Affidavit of Drug Enforcement Administration (DEA) Task Force Officer (TFO) Dale Boothroyd, which is attached hereto and fully incorporated herein by reference.

Defendant $43,234.00 represents proceeds of, and was intended to be used or was used to facilitate, an illegal marijuana drug trafficking operation; and as such, Defendant $43,234.00 is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

## IV. CLAIM FOR RELIEF

WHEREFORE, Plaintiff United States of America prays that:

1. A Warrant *In Rem* issue for the arrest of Defendant $43,234.00 IN UNITED STATES CURRENCY;

2. That due notice be given to all parties to appear and show cause why the forfeiture should not be decreed;

3. That judgment be entered declaring Defendant $43,234.00 IN UNITED STATES CURRENCY forfeited to the United States of America for disposition according to law; and

4. For such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

DATED June 13, 2019, in Anchorage, Alaska.

BRYAN SCHRODER
United States Attorney

*/s/Kelly Cavanaugh*
KELLY CAVANAUGH
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 W. 7th Avenue, #9, Room 253
Anchorage, AK 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-6011
Email: kelly.cavanaugh@usdoj.gov

# VERIFICATION

I have read the above complaint and know its contents. The matters stated in the complaint are true based upon my own knowledge, or are alleged upon information and belief and I believe them to be true.

I declare under penalty of perjury that the foregoing statement is true and correct.

EXECUTED on June 12, 2019 in Anchorage, Alaska.

_____
Dale Boothroyd, Task Force Officer
Drug Enforcement Administration

Subscribed & Sworn to this 12th day of June, 2019.

Notary Public - State of Alaska
Erika A. Hartmann
My Comm. Expires: 5/5/21

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing VERIFIED COMPLAINT FOR FORFEITURE, together with the Notice of Judicial Forfeiture, were sent via Certified U.S. Mail, Return Receipt Requested, this 13th day of June 2019 to:

Joseph Potter
4260 Scenic View Drive
Anchorage, AK 99504

s/Kelly Cavanaugh
Office of the United States Attorney

U.S. v. $43,234.00 IN UNITED STATES CURRENCY
Verified Complaint for Forfeiture *In Rem*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

$43,234.00 IN U.S. CURRENCY,

    Defendants(s).

No.

**AFFIDAVIT OF DEA TFO DALE BOOTHROYD IN SUPPORT OF VERIFIED COMPLAINT FORFEITURE IN REM**

I, Dale Boothroyd, am a Task Force Officer with the Drug Enforcement Administration (DEA), in the Anchorage, Alaska, District Office, and in that capacity declare and state as follows:

1. I have been employed as a Task Force Officer with the Drug Enforcement Administration since October of 2018. Prior to my assignment with the Drug Enforcement Administration, I was assigned to the Statewide Drug Enforcement Unit with the Alaska State Troopers from April 2018 to September 2018. Prior to my assignment with AST, I was assigned to uniformed patrol with the Anchorage International Airport Police/Fire Department for six years. Thus, in total I have approximately 7 years of law enforcement experience.

2. During the course of your affiant's law enforcement career, I have written and/or executed in excess of forty (40) search and seizure warrants for narcotics, dangerous drugs, and related records, and assisted in the seizure of hundreds of thousands of dollars in proceeds and/or assets derived from such illegal activity.

3. During the course of my employment as a Law Enforcement Officer, I have gained experience in conducting drug investigations and have received the benefit of many years of such experience of fellow agents, investigators and officers.

4. During the course of my employment with the these three agencies, I have worked in an undercover capacity and conducted investigations of controlled substances violations in conjunction with agents, investigators and officers from other jurisdictions. I have

1

also worked with and conducted investigations utilizing confidential sources. I have also conducted or assisted in investigations which have led to the arrest and conviction of persons for violations dealing with the sale, possession and/or manufacture of controlled substances, and the seizure and forfeiture of assets. As part of these investigations, I have able to interview arrested subjects and their associates. Through these interviews, your Affiant has learned how and why these offenders conduct various aspects of their drug trafficking activities, to include communicating, manufacturing, packaging, distribution, transportation and concealment of controlled substances and assets and money laundering.

5.  I attended the Alaska Law Enforcement Training Academy #12-02 where I received 947 hours of training. I have obtained my Intermediate Police Certificate from the Alaska Police Standards Council. I have attended a 40 hour "Jetway" training course presented by the Drug Enforcement Administration and El Paso Intelligence Center. I have attended a 40 hour "Undercover Survival and Tactics" course present by the Midwest Counterdrug Training Center. I have also attended a 7 hour course on Drugs in Alaska at the State Crime Laboratory. I have obtained an A.A.S degree from Finger Lakes Community College, graduating in 2009 with a major in Conservation Law Enforcement. Based upon my training, experience and participation in these and other drug trafficking investigations, and based upon my conversations with other experienced law enforcement agents and officers, with whom I work, I know the following:

6.  From my experience, I have found that the distribution of controlled substances is frequently a continuing activity over months and years. Persons involved in the trafficking of illegal controlled substances typically will obtain and distribute controlled substances on a regular basis. Drug traffickers will maintain an "inventory" which will fluctuate in size depending upon the demand for and the available supply of the product. It has been my experience that drug traffickers keep records of their illegal activities not only during the period of their drug trafficking violations but also for a period of time extending beyond the time during which the trafficker actually possesses/controls illegal controlled substances. The records are kept in order to maintain contact with criminal associates for future transactions and so that the trafficker can have records of prior transactions for which the trafficker might still be owed money or might owe someone else money. In my experience, drug traffickers often have records of customers, as well as evidence of suppliers and co-conspirators, in one or more cellular telephones, either in the contact lists, sent or received calls, or text messages. I know that in

United States v. Terry, 911 F.2d 272 (9th Cir. 1990), United States v. Angulo-Lopez, 791 F.2d 1394,1399 (9th Cir.1986), United States v. Hernandez-Escargega, 886 F. 2d 1560, 1567 (9th Cir. 1989) and in United States v. Fannin, 817 F. 2d 1379, 1381-1382 (9th Cir. 1987), the court held that in the case of drug traffickers, evidence is likely to be found where dealers live and a search warrant may be properly issued against a suspected drug dealer's residence despite the lack of direct evidence of criminal activity at the residence. The court also held, in United States v. Cardoza, 769 F. 2d 625, 630 (9th Cir. 1985), that a search warrant may be properly issued to search a drug trafficker's storage locker despite lack of direct evidence linking the storage locker to criminal activity.

7. It is common for members of drug trafficking organizations to maintain records evidencing their illegal activities including books, ledgers, receipts, notes and other papers relating to the transportation, ordering, possession sale and distribution of drugs and the collection and transportation of drug proceeds. I also know that the aforementioned books, records and ledgers etc., are frequently maintained in the drug trafficker's residence and sometimes in the traffickers' vehicle(s).

8. It is common for members of drug trafficking organizations to conceal in their residences and businesses in strong boxes, safes, lock boxes, concealed compartments and hidden rooms, large quantities of US currency, foreign currency, financial instruments, precious metals, jewelry, and other items of value which are proceeds from drug trafficking.

9. I know that evidence of excessive wealth is probative evidence of crimes involving greed, to include the distribution of controlled substances. Therefore, receipts showing the expenditure of large sums of money and/or the expensive assets themselves are evidence of drug trafficking. I also know that drug traffickers commonly keep the expensive assets themselves and/or documentation of the purchase of the asset (receipts, warranty cards, etc.) in or about their residences, and sometimes documentation of these assets in their vehicles or businesses.

10. It is common for members of drug trafficking organizations to utilize wire transfer companies, (i.e. Western Union, MoneyGram) to facilitate the movement of US currency throughout the trafficking organization's area of operations. I know that members of drug trafficking organizations will utilize nominee senders to disguise the origination of the funds and to break up the amount being sent by any one person. I know that the actual owner of the

3

currency will commonly provide the nominee sender with hand-written information concerning the intended recipient's name, intended pay-out location and amounts of money to be sent. I also know that, in an attempt to keep track of the proceeds, it is common for the drug traffickers and/or nominee senders to maintain copies of the wire transfer receipts, amounts sent and tracking numbers. I also know that the aforementioned items are frequently maintained in the drug trafficker's residence, businesses, and vehicles.

11. It is increasingly common for members of drug trafficking organizations to utilize direct cash deposits into a co-conspirator's bank accounts to facilitate the movement of US currency throughout the trafficking organization's area of operations. I know that members of drug trafficking organizations will utilize nominee depositors to disguise the origination of the funds and to break up the amount being deposited by any one person. I know that the actual owner of the currency will commonly provide the nominee depositor with hand-written information concerning the intended recipients name and account number and amounts of money to be deposited. I also know that, in an attempt to keep track of the proceeds, it is common for the drug traffickers and/or nominee depositors to maintain copies of the deposit slips. I also know that the aforementioned items are frequently maintained in the drug traffickers and/or nominee depositor's residence, businesses, or vehicles.

12. It is common for members of drug trafficking organizations to utilize express parcel delivery companies, (i.e. Federal Express, United Parcel Service, DHL, and US Postal Service Express Mail) to facilitate the movement of controlled substances and US currency throughout the trafficking organization's area of operations. I also know that, in an attempt to keep track of the packages and their contents, it is common for the trafficker to maintain copies of the shipping receipts and tracking numbers. Parcel companies all have websites where a customer can enter a tracking number to check on the status of a package. When the status is checked, the websites capture the IP Address of the user that checked on the package. That, in turn, can be used to determine the physical address or device that checked on the package. Thus, seizure of cellular telephones, computers, cable modems, and routers can provide evidence linking a suspect to a package containing drugs or money. I also know that members of drug trafficking organizations will utilize nominee senders/recipients to disguise the origination and destination of the packages. I know that the actual owner of the drugs/currency will commonly provide the nominee sender with hand-written information concerning the

4

intended recipient's name and address. I also know that shipping receipts and tracking numbers are frequently maintained in the drug trafficker's residence, businesses, and vehicles. Computers, routers, and cable modems are frequently maintained in a drug trafficker's residence.

13. It is common for members of drug trafficking organizations to utilize fraudulent identification, in order to purchase airline tickets, send wire transfers, rent residences and storage facilities and subscribe for telephone/cellular telephone service. I also know that it is common for drug traffickers to keep fraudulent identification nearby and easily accessible to facilitate their flight upon the discovery of their illegal activities by law enforcement. I also know that the aforementioned items are frequently maintained in the drug trafficker's residence, businesses, or vehicles.

14. It is common for drug trafficking organizations involved in the purchase, dilution, and repackaging of controlled substances for distribution to maintain equipment and supplies (i.e. scales, baggies, cutting agents) on hand over a lengthy period of time, even when they do not have any controlled substances on hand. I also know that the aforementioned items are frequently maintained in the drug trafficker's residence or business. I have also found scales and packaging materials in traffickers' vehicles.

15. It is common for members of drug trafficking organizations to attempt to recruit couriers to transport drugs and/or US currency throughout the trafficking organization's area of operations. I know that often times the couriers handler will provide the courier with hand-written notes regarding travel itinerary, hotel information and contact telephone numbers prior to the courier departing on the trip to transport drugs and/or money. I also know that often times the organizations will pay a flat rate (i.e. $2,000 per kilogram of cocaine) plus expenses for the couriers. Therefore, oftentimes the couriers will keep handwritten itemized lists of expenses and/or receipts, in order to be reimbursed. I also know that the aforementioned items are frequently maintained in the courier's residence or residences and vehicles of members of the drug trafficking organization.

16. It is common for members of drug trafficking organizations to take or cause to be taken, photographs and/or videos of themselves and their co-conspirators and associates. It is also common for members of drug trafficking organizations to take or cause to be taken, photographs and/or videos of themselves and/or their co-conspirators with controlled substances, large sums of money, guns and expensive assets (i.e. jewelry, luxury cars). I also

know that the aforementioned items are frequently maintained in the drug trafficker's residence or business, and often on cellular telephones and computers found in the trafficker's residence

17. It is common for members of drug trafficking organizations to possess scanners, security cameras and computers (with Internet access) to protect and conceal their operation from law enforcement and other criminals and to monitor surveillance activities of law enforcement. Members of drug trafficking organizations often store records related to drug trafficking and money laundering activities using computer equipment. In addition, computers and peripheral devices, such as wireless routers and cable modems, may contain evidence of drug trafficking. For example, I know that drug traffickers commonly check the delivery status of parcels containing drugs and/or money by entering tracking numbers into parcel company or post office websites. These inquiries are captured by these websites, which identify the Internet Protocol (IP) address that performed the inquiry. The IP address can be linked to both a subscriber of internet service, as well as to a Media Access Control (MAC) address, which identifies the piece of computer hardware through which the internet was accessed while making the inquiry. A MAC address is a unique identifier assigned to every piece of hardware that connects to the Internet. In my experience, computers and peripheral devices such as wireless routers and cable modems are commonly maintained for long periods of time at the user's residence. n. It is common for members of drug trafficking organizations to possess firearms and ammunition to protect their drugs, assets, and persons from rival traffickers, other criminals, and from law enforcement.

18. Based on my training and experience, I know that people involved in trafficking controlled substances frequently carry and possess firearms to protect themselves. Drug trafficking is an all-cash business, and drug traffickers are often the targeted by other criminals for robbery because those involved in illegal drug trafficking rarely report thefts or robberies of their drugs and money to the police. Therefore, they carry firearms to protect themselves, their drugs, and their proceeds. Also, lower level drug traffickers tend to be more at risk than higher-level traffickers. It is more likely that lower-level traffickers deal with strangers and drug addicts. Thus, lower-level narcotics trafficking can be more dangerous than dealing at the wholesale level, where there is already an established business relationship with larger customers. Lower level traffickers can be territorial, and can get into disputes with rival traffickers over customers and "turf". Finally, the customers of lower level traffickers are

frequently addicts, who gather money to pay for their drugs through other crimes, primarily theft-related crimes. Because firearms are valuable to narcotics traffickers, customers with stolen firearms often trade them to traffickers in exchange for narcotics.

19. It is common for members of drug trafficking organizations, in an attempt to disguise their identities and illegal activities, to use pre-paid cellular telephones and pre-paid long distance calling cards. I know that often times the only way to connect a subject with a particular pre-paid cellular telephone or calling card is to seize the phone or calling card from the trafficker or his residence. I also know that the aforementioned items are frequently maintained in the drug trafficker's residence, business, or vehicles. Additionally, cellular telephones afford spontaneous access to drug customers and to drug sources. Further, I know that cell phones used by drug traffickers frequently contain data stored w/in which includes the telephone numbers, names, and/or aliases of drug customers and drug sources. Finally, I know that in addition to names and numbers, cell phones used by drug traffickers commonly contain images and recordings.

20. It is common for members of a drug trafficking organization to attempt to legitimize their profits from the distribution of drugs. To accomplish these goals, drug traffickers utilize foreign and domestic banks and the bank's attendant services to include cashier's checks, safe deposit boxes, and money drafts. Drug traffickers will also utilize the purchase/sale of real estate to legitimize their profits. I also know that the records of the aforementioned transactions are frequently maintained in the drug trafficker's residence, business, or vehicles.

21. It is common for members of drug trafficking organizations to utilize businesses, both real and fictitious, to conceal both the distribution of drugs as well as to conceal the source of their illegal income. It is common for drug traffickers to possess business licenses and articles of incorporation for these businesses, even if the businesses exist only on paper. I also know that these records and documents are frequently maintained in the drug trafficker's residence or business.

22. I have become familiar with the practice of some drug traffickers in the use of express parcel shipping services as a method of transporting illegal drugs into Alaska. Using this method, a drug trafficker will acquire drugs from a source state. The drugs will then be placed in a parcel, and arrangements will be made for shipment to Alaska via express shipping

services such as FedEx, UPS, DHL, and the United States Postal Service. Traffickers will commonly provide fictitious information for the sender's name, address, and telephone number. Likewise, traffickers will commonly provide a fictitious name for the recipient, but will use a genuine receiving address to ensure delivery. The use of a nominee's address is common for receipt of the parcel, as many traffickers are reluctant to receive parcels at their own addresses. Some traffickers are willing to be present at the receiving address when the parcel arrives. Other traffickers will avoid the receiving address until after delivery of the parcel, and others will instead direct a nominee to transport the parcel to second or subsequent locations. Additionally, traffickers will sometimes hi-jack an address, shipping a parcel to an address known to be vacant, or whose occupant's schedule is known to the trafficker, arranging delivery at a time when the occupant is expected to be absent. I am also familiar with the practice of some traffickers to pay nominees to obtain mailboxes to which parcels will be shipped. Based on my training and experience, I know that the locations where parcels containing controlled substances and/or drug proceeds are shipped to commonly hold evidence of drug trafficking.

23. Based on my training and experience, I know that California is a source state, that is, a state from which controlled substances are commonly shipped to Alaska, and likewise, a state to which drug proceeds are commonly shipped.

24. Based on my experience, narcotics trafficking operates in a pyramid-like structure, with the largest wholesale traffickers at the top of the pyramid, and the traffickers who deal directly with customers at the bottom. There are several levels of traffickers in the middle. As you travel down each level of trafficker, the drugs can be diluted to increase their volume, and therefore profit. At the bottom level, drugs are sold to individual users who are often drug addicts.

25. Based on my training and experience, I know that people involved in the use, possession, manufacture, importation, and/or trafficking of controlled substances commonly possess and use cellular telephones, telephones, and computers to facilitate these activities. Regarding cellular telephones in particular, I know that drug traffickers will use cellular telephones to facilitate their activities because of the mobility offered by cellular telephones. Further, drug traffickers are attracted to cellular telephones because they enable suspects to avoid the risks attendant with operating from a fixed location. Additionally, cellular telephones afford spontaneous access to drug customers and to drug sources. Further, I know that cell phones used

by drug traffickers frequently contain data stored w/in which includes the telephone numbers, names, and/or aliases of drug customers and drug sources. Further, I know that in addition to names and numbers, cell phones used by drug traffickers commonly contain images and recordings of people involved in trafficking, images of firearms used in these activities, images of controlled substances, and images of drug trafficking proceeds, and further that these images are often retained long after the images are captured.

26. Based on my training and experience, I know that trafficking controlled substances is a cash business, and frequently very lucrative. Also based on my training and experience, I know that people involved in the possession, manufacture, importation, and/or trafficking of controlled substances commonly possess money generated by these activities, and further that these people commonly possess stolen property accepted in exchanges for controlled substances. Further, based on my training and experience, I know that people involved in the possession, manufacture, and/or distribution of controlled substances commonly maintain and possess firearms to protect themselves, their controlled substances, and their trafficking proceeds. Further, I know that the above described documents, money, stolen property, and firearms are commonly found in the vehicles and residences of drug traffickers, as well as in other places maintained for the trafficking of controlled substances, as well as lower profile locations sometimes referred to as "stash houses."

## FACTS PERTAINING TO THIS INVESTIGATION

27. On 11/08/2018 the Drug Enforcement Administration received a tip from a confidential human source (CS) RAP-18-05, that Joseph S. POTTER has been illegally growing and selling "massive amounts of marijuana for years." The CS stated POTTER has plants currently growing at his residence, 4260 Scenic View Drive, Anchorage, AK 99504 and another location. The CS stated POTTER launders money and makes frequent bank deposits under $10,000 to "fly under the radar", and in turn pays off his credit cards. The CS states POTTER hasn't filed taxes in over 5 years and is making hundreds of thousands of dollars.

28. Because this affidavit is being submitted for the limited purpose of establishing probable cause, I have not included in this affidavit every detail of every aspect of the investigation. Rather, I have set forth facts that I believe are sufficient to establish probable

cause for the issuance of the requested search warrant. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

29. The CS mentioned around the time they were filing 2016 taxes together, POTTER had the CS at the computer "fudging" numbers in order to get the health insurance to return the amount he wanted to pay. The CS stated they voiced their frustration with the situation to POTTER for months and in December 2016 the CS stated POTTER pulled a handgun on the CS. The CS stated POTTER was arrested and that ended their relationship. The CS moved to Illinois and stated when they left they took approximately forty thousand dollars in cash from the bedroom at 4260 Scenic View Drive. The CS' ultimate goal in cooperating with law enforcement is to obtain full custody of the child shared with POTTER. The CS stated at the time, there was a pending trial set for March regarding child custody agreements with POTTER and to determine if the Office of Children's Services should become involved.

30. On 12/11/2018 at 1006 hours, I conducted a telephonic interview of the CS. The CS stated that POTTER currently lives at 4260 Scenic View Drive, Anchorage, AK and has a large Marijuana grow in the garage of that residence. The CS stated the two car garage was converted into a marijuana grow, with mature plants on one side and immature plants inside a tent in another portion of the garage. The CS stated POTTER rents the Scenic View Drive house and he pays cash to his "business partner" Danny HA, who in turn pays the home owner, Rosalina HUGHES, who lives in Las Vegas.

31. An Alaska Public Safety Information Network (APSIN) records check revealed Joseph POTTER'S (ADL 6906737) residential and mailing address is listed as 4260 Scenic View Drive, Anchorage, AK 99504. The Municipality of Anchorage Public inquiry parcel detail's lists Rosalina HUGHES as the property owner of 4260 Scenic View Drive.

32. The CS stated POTTER kept cash in his bedroom dresser and clothes pockets hanging in his bedroom closet full of cash from his marijuana sales. The CS knows this from living with POTTER.

33. TFO Boothroyd was provided photographs of the marijuana grow at 4260 Scenic View Drive from which the CS indicated were taken in June of 2018. According to The Department of Commerce, Community and Economic Development, POTTER currently has a business license #1062366 for "Crystal Craze Consults." The status is listed as "active" as a

sole proprietor, with an issue date of 11/15/2017 and expiration date of 12/31/2020. The mailing and physical address listed on the business license is 4260 Scenic View Drive, Anchorage. According to the CS, POTTER has previously used businesses in his name to conceal and launder money.

34. On 12/11/2018 TFO Boothroyd contacted Special Investigator J. Bankowski who works for the enforcement unit of the Alcohol and Marijuana Control Office. TFO Boothroyd provided Inv. Bankowski the business license number and name of the business licensed to POTTER. Inv. Bankowski advised me that Joseph POTTER is not a marijuana business licensee nor does he have a marijuana handler permit that would allow him to work at one of these establishments, grow, handle or sell marijuana.

35. The CS stated POTTER previously had a business opened under the name "Spablue" and POTTER planned on using that to purchase a house and launder money. The CS stated POTTER got a business bank account with both his and the CS' name on the account. The CS stated they noticed a couple times where POTTER made cash deposits and then would immediately withdraw them. The CS stated over the course of a year, POTTER began "manipulating and berating" the CS by insisting the business was going to be used to launder the money POTTER made with growing and selling marijuana. The CS stated POTTER said they would be able to put a large sum down on a house with two years of falsified tax returns. The CS stated POTTER added 60-80 thousand dollars in cash toward the business one year and paid taxes on it to make it appear legitimate. According to The Department of Commerce, Community and Economic Development, POTTER had a business license for "Spablue by Alysha" under license #1013551, from 12/042014 to 12/31/2015.

36. The CS provided TFO Boothroyd with an audio recording they stated was from January of 2017. In the recording, POTTER and the CS are in a heated conversation. During the course of the conversation, the male voice who the CS states is POTTER, can be heard saying the only reason they opened the Spablue business was to launder proceeds of drug trafficking. POTTER also explained to the CS how they use drug proceeds to pay their taxes and credit cards through the Spablue business.

37. According to bank records POTTER made large cash deposits immediately followed by large credit card payments to Capitol One and Chase. Between March 2016 and July 2016, POTTER deposited $42,200 in cash and $49,006.35 went out in credit card payments. This

11

is consistent with statements made by the CS. The CS also stated POTTER would always tell them as long as he deposits less than ten thousand dollars he won't get flagged.

38. The CS stated POTTER paid cash for a motorhome, side by side ATV, and Dodge Dart which were purchased on Craigslist. An Alaska Public Safety Information Network (APSIN) records reveal POTTER owns a 2013 Dodge Dart bearing AK plate GMX990. Records do not show a lien on the vehicle. APSIN also showed POTTER owning a 1998 Fleetwood Pace Arrow motor home bearing AK plate JHV299. Records do not show a lien on the vehicle.

39. Administrative subpoena RG-19-192456 was served to Chugach Electric for the active electrical utility records for 4260 Scenic View Drive, Anchorage, AK 99504. The average usage for the suspect residence at 4260 Scenic View Drive is 114 kW per day from December 2017 to December 2018. According to a public inquiry on parcel details, 4260 Scenic View Drive is a 1675 square foot home with a 732 square foot attached garage.

40. By speaking with personnel from Chugach Electric, I know that, including fees, the approximate cost of one kilowatt hour of electricity for a residential home is 19-20 cents. The typical homeowner (2000 square feet, 23 kW per day average) would then pay approximately $138 per month ($.20x23x30 for a 30 day billing period) whereas a large residence homeowner (5900 square feet, 45kW) would pay an average of $270 per month. The affiant's current residence is approximately 1700 square feet and the affiant's average use is approximately 38kW per day. Inv. Calt with the Alaska State Troopers, who stated a previous residence he lived at was approximately 2300 square feet with an additional 576 square foot garage and that residence average use was approximately 14kW per day.

41. The suspect's average yearly rate of 114 kW per day at 4260 Scenic View Drive from December 2017 to December 2018, would have him paying approximately $649 each month on average.

42. One 1000 –watt grow light operating 12 hours a day will use approximately 12kW per day. The suspect's average use is 114kW per day, subtracting the average daily use of 23kW, it is possible that approximately 7-8 grow lights could be in use.

43. Based on speaking with other investigators, I know that the average grow light system can support an average of 20-25 marijuana plants. I know the typical indoor grown

12

marijuana plant will produce an average yield of 8 ounces of marijuana, but can produce more than one pound of processed marijuana.

44. There is nothing at the suspect property to suggest that it is being used for business purposes that would justify the suspiciously high electrical use. It is also probable that the average daily electrical use of 114kW per day in excess of the typical home (23 kW) is because of growing equipment required and involved in the typical commercial marijuana grow operation.

45. On 12/11/18 at 1309 hours, TFO Boothroyd observed a silver Dodge Dart bearing Alaska plate GMX990 leaving 4260 Scenic View Drive. TFO Boothroyd confirmed Joseph POTTER was the driver of the vehicle as TFO Boothroyd has seen his photograph from DMV records. On 12/11/2018, 01/09/2018, 1/15/2018, and 01/29/2018, TFO Boothroyd observed the silver Dodge Dart bearing AK plate GMX990 parked at 4260 Scenic View Drive. The subject vehicle was always parked outside of the garage. On 01/15/2018 TFO Boothroyd observed what appeared to be 4 purple bags of potting soil on the porch of the subject premises.

46. On 01/29/2019, S/A Damon and S/A Lathrop were taking photographs of the target residence and observed a silver Dodge Dart bearing Alaska plate GMX990 registered to POTTER, pull in the driveway at approximately 1452 hours. They observed a white male exit the vehicle and enter the front door at 5422 Camelot Drive. The white male was inside briefly then exited and left in the vehicle. At approximately 1458 hours, S/A Damon and S/A Lathrop observed a blue Subaru bearing Alaska plate JCH417 arrive at the target residence. They observed an individual later identified as POTTER from a DMV photograph exit the vehicle and enter the 5422 Camelot Drive side of the duplex. POTTER was inside for approximately 1-2 minutes then left as the passenger in the vehicle with a black spray can visible in his hand. An APSIN records check revealed vehicle JCH417 is registered to Zachary ALZAYER. TFO Boothroyd sent a photograph of AlZAYER to the CS. The CS identified him as "Zach" and stated he purchases marijuana from Joe (POTTER) by the pound.

47. According to the Alaska Department of Labor and Workforce Development, POTTER has no reportable wages from 2015 through 2018.

48. On 02/01/2019, Federal Search Warrant (3:19-mj-00064-dms) for 4260 Scenic View Drive, Anchorage, AK was granted.

49. On 02/04/2019, the search warrant was executed by members of the DEA, AST Statewide Drug Enforcement Unit, APD and the Alcohol and Marijuana Control Board. Officers detained POTTER, who was identified through his DMV photo and also his Alaska driver's license.

50. The search of the residence revealed evidence of marijuana cultivation to include a large water holding tank, ventilation systems, lights and ballasts, hoses, a tent with lighting equipment, numerous pots, zip lock bags, potting soil, plastic sheeting, and processed marijuana within a black tub which also contained zip lock bags. All of which was located in the garage. Numerous baggies of what appeared to be marijuana seeds were located on top of POTTER's dresser in his bedroom along with a ball of multicolored rubber bands.

51. Additional items located and seized during the search of the residence include the following: (12) full gallon size zip lock bags of processed marijuana inside the kitchen freezer, along with (2) partially full gallon size zip lock bags which also contained processed marijuana (total of approximately 8.08 pounds) and a digital scale. Officers seized $913.00 in U.S. Currency located on top of POTTER's dresser. Additionally, officers discovered more currency hidden beneath POTTER's dresser. The currency was later determined to be $42,321.00. For a total seizure of $43,234.00 in U.S. Currency.

52. On the same day, Federal Search Warrant (3:19-mj-00065-dms) for an address associated to POTTER, 5422/5424 Camelot Drive, Anchorage AK was executed by members of the DEA, AST Statewide Drug Enforcement Unit, APD and the Alcohol and Marijuana Control Board. Based on electrical records, POTTER is the customer registered to 5422 Camelot Drive. 5422 and 5424 Camelot Drive are co-located in one building but was previously designed to be a separate, single family "townhouse" style dwellings. Both residences were accessed through the door marked 5422 and the entire structure was being utilized to facilitate a single commercial marijuana growing operation. In all, 175 rooted marijuana plants (228 green/wet pounds), 18.66 pounds of processed marijuana, 30 metal halide lights, and 21 ballasts were seized.

53. Based on my training and experience and my knowledge of the above listed facts in this investigation, I believe there is probable cause to believe the seized $43,234.00 in U.S. Currency is proceeds of, and was intended to be used or was used to facilitate the marijuana

drug trafficking and money laundering operation conducted by POTTER and is subject to forfeiture under 21 U.S.C. § 881(a)(6).

I declare that the foregoing is true and correct to the best of my knowledge and belief.

EXECUTED on June /2, 2019 in Anchorage, Alaska

_____        _____
                                  Dale Boothroyd
                                  Task Force Officer
                                  Drug Enforcement
                                  Administration

Subscribed and sworn to before me on ~~May~~ June 12, 2019 in
Anchorage, Alaska.

_____
NOTARY PUBLIC, State of Alaska
My commission expires:

Notary Public - State of Alaska
Erika A. Hartmann
My Comm. Expires: 5/5/21

15